IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY ARMSTRONG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN KERESTER | : | NO. 08-1165 |

REPORT AND RECOMMENDATION

JACOB P. HART                                                                        DATE:   November 12, 2008
UNITED STATES MAGISTRATE JUDGE

This is a *pro se* petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by an individual currently incarcerated at the State Correctional Institute at Mahoney, in Frackville, Pennsylvania. For the reasons that follow, I recommend that the petition be denied.

I.      Factual and Procedural Background

On June 11, 1991, in the middle of the day, two jewelers were shot at close range and killed during the robbery of a jewelry store named The Gold Connection on South 60th Street in Philadelphia. Testimony of Dr. Edwin Lieberman, Notes of Testimony, June 12, 2008 at 48-70. Witnesses told police that a man entered the jewelry store, while a second man stood outside, trying to convince two high school girls waiting at a bus stop to move further down the block. Testimony of Earl Dixon, Notes of Testimony, June 12, 2008, at 131; Testimony of Nasheta Little, Notes of Testimony June 13, 2008 at 20. The first man, now holding a gun, then opened the locked front door to the jewelry store to admit the second man. Testimony of Earl Dixon, supra, at 134; Testimony of Nasheta Little, supra, at 25-26. After this, shots were heard. Testimony of Nasheta Little, supra, at 25-26. The two men left the store, one carrying a brown briefcase, and they drove away in a small, red car. Testimony of Earl Dixon, supra, at 134.

A few days after the killings, an individual named Craig Thomas contacted the Pennsylvania Crime Commission and told police that he was at the scene of the crime and recognized the men as Andre Natson and Clarence Glenn.  Testimony of Craig Thomas, Notes of Testimony, June 17, 2008 at 35-41.  However, this did not lead to any arrests.

In 2001, the INS took into custody a Jamaican national named Earl Dixon, for illegal reentry to the United States.  Testimony of Detective John Keen, Notes of Testimony, June 16, 2003, at 52-56.  At the time of the Gold Connection robbery and killings, Dixon had owned a clothing business next door to the jewelry store.  Testimony of Earl Dixon, supra, at 119.  While in custody, Dixon told the INS, and later the police, that he could identify petitioner Gary Armstrong as one of the two men responsible for the crime.  Testimony of John Keen, supra.  He recognized Armstrong from the Jamaican community, and also knew that he was the former boyfriend of a woman who was dating his brother.  Testimony of Earl Dixon, supra, at 120, 121.  Dixon said he had also recognized the other man as a Jamaican he knew only as Mark.  Id. at 123.

Ronald Johnson, who had been working at Dixon's clothing store at the time of the crime, had seen the man who stood outside the jewelry store full in the face.  Testimony of Ronald Johnson, Notes of Testimony of June 13, 2003, at 99-100, 107.  When re-contacted in 2001, he identified a picture of Armstrong as that man.  Testimony of Ronald Johnson, supra, at 117-118.  Nasheta Little, one of the two high school girls who had been standing by the bus stop, was also re-contacted and identified Armstrong, though tentatively, as the man who had urged her and her friend to move down the block.  Testimony of Nasheta Little, supra, at 32-35.  In 1991, Little had told the police that the man spoke with a heavy Jamaican accent.  Id. at 21-22.

Armstrong was arrested in the state of Georgia and charged with the murders of the two jewelers. Testimony of Detective Dougherty, Notes of Testimony, June 16, 2003, at 83. On April 16, 2002, he arrived in Philadelphia. Id. Late in the afternoon of that day, Detective James Dougherty spoke with him. Id. The conversation lasted over two hours, although Armstrong refused to be recorded, or to let Detective Dougherty write anything down. Id. at 86-87. During the conversation, Armstrong admitted that the had been on the block where the jewelry store was located at the time the crime took place, but said he had only visited an appliance store and a "West Indian store" near the jewelry store. Id. at 94.

At a certain point, Armstrong terminated the conversation. As described at trial by Detective Dougherty:

> And at that point, Detective Brown [Detective Dougherty's partner, who had recently entered the room] asked Mr. Armstrong if he was willing to roll the dice in court about this incident because he was still maintaining that he did not take part in this, that he was in or just outside the West Indian store when he heard this loud explosion. At that point, Mr. Armstrong said, I have nothing more to say, I've said enough already. He said I talked to my mother, and he said, my lips are sealed, I just have to roll the dice. My brother told me that I had a bad choice of friends. He said, I'm here dealing with this now and some low life that did this is out there, probably dead now.
>
> At that point Detective Brown left the room. At that point it was approximately 7:24 p.m. I then went on to ask Mr. Armstrong one more question while we were alone and I told him that sometimes that we can [be] dragged into situations that we didn't fully understand and that we may not be totally responsible for what happens. Mr. Armstrong just said, I'm just going to roll the dice, I am tired, and I don't want to talk no more. With that, I then left the room and that was at approximately 7:28 p.m. and I immediately went to the back area of the homicide division, sat down and wrote the notes of the conversation that Mr. Armstrong and I had, along with detective Brown.

Id. at 102-104.

Armstrong was tried before the Court of Common Pleas for Philadelphia County between June 12 and 19, 2003. Notes of Testimony, June 12-19, 2003. At his trial, there was contradictory testimony on identification. Earl Dixon identified Armstrong. Testimony of Earl Dixon, supra, at 120. Earl Dixon's brother Carol Dixon, confirmed that Earl Dixon had told him of Armstrong's involvement a few weeks after the crime took place. Testimony of Carol Dixon, Notes of Testimony, June 16, 2003, at 24-26. He also identified Armstrong in the courtroom. Id. Ronald Johnson, as well, identified Armstrong. Testimony of Ronald Johnson, supra, at 107.

Craig Thomas, however, testified that he had been standing next to a pay phone close to the Gold Connection when he saw Andre Natson and Clarence Glenn, neither of whom was Jamaican, flee the crime scene. Testimony of Craig Thomas, Notes of Testimony, June 17, 2003, at 33-40, 63-65.

Nesheta Little testified that she recognized Armstrong's picture, although not with certainty, in a 2001 photo array. Testimony of Nesheta Little, supra, at 33-36. Interestingly, from the same photo array, she had also identified a picture of Andre Natson as resembling the man with the gun who had first entered the jewelry store. Id. at 38.

Armstrong's attorney argued to the judge that he should be permitted to present evidence of two other killings for which Andre Natson had been convicted, to strengthen the inference that Natson and Glenn committed the Gold Connection murders. Notes of Testimony, June 16, 2002, at 6-10. He argued that it was admissible under Pennsylvania Rule of Evidence 404(b)(2), to show a common plan, scheme or design on Natson's part. Id. at 9. The trial judge refused to admit the evidence, because Armstrong's counsel had no evidence that Natson's murders were sufficiently similar to those at issue. Id. at 10. Counsel conceded that he had no information about the nature of the murders. Id.

4

Detective Dougherty also testified at trial, as noted above. On cross-examination, Armstrong's counsel asked him why he had not returned to the block to explore Armstrong's claim that he had been at an appliance store at the time of the shooting. This exchange took place:

> DOUGHERTY: It's our experience that after 11 years, especially in the area of 60th and Market, there has been a tremendous changeover in who runs the stores there, and we knew that it would be a waste of time for us to go back there 11 years later as far as an appliance store which, even if it did exist, we knew, we believed, that Mr. Armstrong was lying about his real reason for being at 60th and Chestnut Street.
>
> COUNSEL: So you thought that Mr. Armstrong was lying the moment that you heard what he said, is that what you are telling the ladies and gentlemen [of the] jury?
>
> DOUGHERTY: No, Counselor. When he told me that he was there when this robbery occurred, I knew that he was telling the truth.
>
> COUNSEL: But when he told you about going there to purchase an appliance, you thought that he was lying?
>
> DOUGHERTY: Yes sir, especially since he had already told me or he had told me as we went on in the interview that he had no money with him that day.

Notes of Testimony, June 16, 2003 at 110.

During his closing argument, Armstrong's trial counsel recalled the detectives' comments to Armstrong about "rolling the dice":

> You heard of the good cop, bad cop scenario. Well, what do you think was going on? We saw the way that Detective Dougherty spoke on the stand, very soft spoken. I asked him, is that the way he spoke to Mr. Armstrong? Sure. And that's when the comment about the roll of the dice was made to Mr. Armstrong. To convey to Mr. Armstrong that we're going to get you even if you are innocent. That we don't even care. And Mr. Armstrong, he waived all his rights, waived his right to silence, waived his right to counsel, went against what his mother and his sister told him about not talking to anyone, and he told the police what he knew.

Notes of Testimony, June 18, 2003, at 63.

5

>Counsel referred to the remarks at other times in his closing, arguing:
>
>>Well, they played this good guy, bad guy scene with the defendant and it didn't work because he still wouldn't confess to the crime. And he didn't confess because he's not guilty. And when they told him, well, you can roll the die, the odds are in our favor, he decided he's going to roll the dice, I am just going to have to roll the dice. Innocence will sometimes do that.

Id. at 65. And, later: "They didn't care. In their minds they closed the case. We're going to come in here in front of the jury, the odds are in our favor, we're going to get you convicted of first degree murder." Id. at 66.

On June 19, 2003, the jury returned a verdict finding Armstrong guilty of two counts of murder in the second degree, and one count each of robbery, conspiracy, violation of the Uniform Firearms Act, and possession of an instrument of crime. Notes of Testimony, June 19, 2003, at 4-5. He was sentenced on August 1, 2003, to two concurrent life terms for the murders, and shorter concurrent terms for the lesser charges. Habeas Corpus Petition at 4.

Armstrong filed post-trial motions in which he argued that the court's refusal to admit Natson's criminal history violated his constitutional right to present a defense, as well as his rights under Pa. Rule of Evidence 404 to the admission of such evidence. Defendant's Amended Post-Sentence Motions, attached to Response as Exhibit C. He also argued that the evidence at trial was insufficient to support his convictions for conspiracy and accomplice liability. Id. These motions were denied.

Armstrong then filed an appeal in the Pennsylvania Superior Court, raising the same issues he put forward in his post-trial motion. Commonwealth v. Armstrong, 858 A.2d 1270 (Pa. Super. 2004) (table), unpublished Memorandum Opinion of June 18, 2004, attached to Response as Exhibit A. The Superior Court, however, affirmed the sentence against him. Id. The

Pennsylvania Supreme Court denied *allocatur* on November 12, 2004.  <u>Commonwealth v. Armstrong</u>, 863 A.2d 1141 (Pa. 2004) (table).

Armstrong then sought relief under Pennsylvania's Post-Conviction Relief Act (PCRA), 42 Pa. C.S. § 9541 *et seq*.  Among other arguments in his PCRA petition, Armstrong argued that his trial counsel had been ineffective in failing to object to Detective Dougherty's testimony that Armstrong had ended their conversation on April 16, 2002, by saying he was willing to roll the dice and did not want to talk anymore.  <u>Commonwealth v. Armstrong</u>, May Term, 2002, No. 1208 1/1 (Slip. op. February 15, 2006).  This, Armstrong claimed, was an impermissible reference to his invocation of his Fifth Amendment right to remain silent.  <u>Id</u>.  Armstrong also alleged that counsel was ineffective for eliciting testimony from Detective Dougherty that he thought Armstrong was lying.  <u>Id</u>.

The trial judge denied Armstrong PCRA relief.  <u>Commonwealth v. Armstrong</u>, May Term, 2002, No. 1208 1/1 (C.C.P. Phila., Feb. 15, 2006), attached to Response as Exhibit D.  On July 3, 2007, the Superior Court affirmed the trial court's decision.  <u>Commonwealth v. Armstrong</u>, 932 A.2d 248 (Pa. Super. 2007) (table) (unpublished memorandum opinion attached to Response as Exhibit B).  The Pennsylvania Supreme Court again denied *allocatur*.  <u>Commonwealth v. Armstrong</u>, 938 A.2d 1051 (Pa. 2007) (table).

Armstrong filed a second PCRA petition on February 14, 2008.  <u>See</u> District Attorney's Office Letter to Court of October 23, 2008, and attachment.  The issues raised there are not pertinent to those he raises here.

In this petition for habeas corpus relief, filed on March 10, 2008, Armstrong argues that his right to present a defense under the United States Constitution was violated by the trial court's decision not to permit him to introduce evidence at trial of Andre Natson's criminal history. He also maintains that his trial counsel was inadequate when he (a) elicited testimony highlighting his (Armstrong's) assertion of his right to silence and (b) elicited testimony that Detective Dougherty thought Armstrong was lying.

II.   Discussion

A.   Armstrong's Right To Present A Defense

1.   The Legal Standard

The United States Supreme Court has said: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal citations omitted). That right is abridged by evidence rules that infringe upon a weighty interest of the accused, and are arbitrary or disproportionate to the purposes they are designed to serve. Holmes v. South Carolina, 547 U.S. 319, 324 (2006), citing United States v. Scheffer, 523 U.S. 303, 308 (1998).

The Court of Appeals for the Third Circuit has interpreted this as meaning that, "under exceptional circumstances" a defendant may have a constitutional right to present evidence otherwise barred by FRE 404(b). U.S. v. Williams, 458 F.3d 312, 318 n. 5 (3d Cir. 2006). (FRE 404(b) is essentially identical to Pennsylvania Rule 404(b), except that the Pennsylvania rule specifically requires that, in a criminal case, 404(b)(2) evidence must be shown to be more probative than prejudicial).

Holmes concerned a state rule which precluded a defendant from introducing evidence tending to show a third party's guilt for the crime at issue, where the state had put forward strong forensic evidence of the defendant's guilt. 547 U.S. at 329. The United States Supreme Court found the state rule unconstitutional because it focused on the strength of the prosecutor's case without taking into account the possible strength of the defense.

However, the Holmes court noted that evidentiary rules – specifically including those which regulate the admission of evidence of third-party guilt in a criminal trial – are constitutional when they permit judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice or confusion of the issues.'" Id. at 326-327, quoting Crane v. Kentucky, supra; and citing 41 C.J.S., Homicide § 216, pp. 56-58 (1991), and 40A Am. Jur. 2d, Homicide § 286, pp. 136-138 (1999) (re: evidence of third-party guilt). This, then, is the legal standard I apply here.

2.      The Applicable Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that, where a state court has adjudicated a matter on its merits, a federal habeas court must treat the state court's conclusion with deference, disturbing it only where:

> the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Armstrong claims that he is entitled to *de novo* review on this issue because, although he raised the issue of Natson's history as both a federal issue, and a state evidentiary issue in his post-trial motions and his direct appeal, the Superior Court did not address the federal issue. Therefore, there was no state "adjudication of the claim."

The District Attorney responds that, although the Superior Court did not cite federal law, or mention the United States Constitution, it did address the federal claim when it wrote that: "a defendant has a fundamental right to present evidence provided it is relevant and not subject to exclusion under any established evidentiary rule." June 18, 2004, Memorandum Opinion, supra at 4. The Superior Court cited for this proposition a state court case, which, through a line of three state cases, derived from Chambers v. Mississippi, 410 U.S. 284 (1973), a case discussed in Holmes, where the Supreme Court invalidated a state hearsay rule on due process grounds. Commonwealth v. Jones, 826 A.2d 900, 908 (Pa. Super. 2003) (*en banc*), citing Commonwealth v. McGowan, 635 A.2d 113, 115 (Pa. 1993), which cites Commonwealth v. Ward, 605 A.2d 796, 797 (Pa. 1992), which cites Chambers v. Mississippi, supra.

In any event, the United States Supreme Court has held that the right to deferential review under AEDPA does not require citations to federal cases – "indeed, it does not even require *awareness*" of federal cases, "so long as neither the reasoning nor the result of the state court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).

While I recognize the merits of the District Attorney's argument in favor of deferential review, it is not necessary to decide which standard of review applies in this case. As discussed below, Armstrong's claim in this regard would not succeed even under *the de novo* review he seeks.

3. <u>The Merits of the Claim</u>

After consideration of the record, I recommend a finding that the state court's use of Pa. Rule of Evidence 404(b) did not infringe upon Armstrong's weighty interest, and was not arbitrary or disproportionate to its purpose, as required by <u>Holmes</u> for a finding of unconstitutionality. This is because the rule simply permitted the trial judge to exclude Natson's criminal history as "marginally relevant."

Indeed, the relevance of Natson's prior crimes was only marginal. This is not to say the evidence was completely irrelevant: if the jurors believed that Natson – and not a man of Jamaican descent named "Mark" – was the Golden Connection shooter, they might have been less likely to accept Earl Dixon's identification of Armstrong as the second man involved in the crime.[1] The evidence offered by Armstrong would have shown the jury that Natson was a homicidal criminal operating in the same area at roughly the same time.

Nevertheless, the evidence was marginal, because it would not have precluded a finding that Armstrong was the second man involved in the crime. Since Natson was alleged to have been the man holding the gun, and Armstrong the second man, who stood outside, this was not a third-party guilt case like <u>Holmes</u>, where Natson could have been found to have been the criminal *instead* of Armstrong. As a simple matter of physical possibility, Natson and Armstrong could have committed the crime together. The jury might have concluded that they did. Or the jury might have concluded that, since Dixon, Ronald Johnson, and Nasheta Little

---

[1] This fact was obscured by the state courts, which wrongly concluded that the evidence suggested that Natson and "Mark" were one and the same. There was no such evidence. And, as Armstrong's lawyer pointed out in his closing, the prosecution offered no evidence that Armstrong knew Natson. Notes of Testimony, June 18, 2003, at 51.

11

were able to provide eye-witness identifications of Armstrong – and given that Armstrong was the sole defendant in the trial – it simply did not matter who his partner was.

Moreover, as noted above, at the time of trial Armstrong had no evidence that Natson's crimes were sufficiently similar to the Gold Connection killings to show a common plan, scheme or design. At that time, Armstrong clearly had not shown more than a "marginal relevance" in the evidence he sought to admit.

Armstrong subsequently obtained more information regarding the nature of Natson's crimes, and has attached it as an exhibit to his Memorandum of Law in support of his habeas petition. Interestingly, the new information weakens his claim of relevance. While the trial court was looking for similarity such as that "he entered a store, preferably a jewelry store in that location ... and robbed and killed the owners by putting guns to the heads of the people", (Notes of Testimony, June 16, 2003, at 9), in fact, Natson killed a female companion inside a residence, and also shot and killed two young men in his neighborhood, in the street. Exhibit to Memorandum of Law. His third conviction was for armed robbery of an individual. Exhibit to Memorandum of Law.

Thus, the evidence Armstrong sought to admit was not strong under a 404(b) analysis. Further, even if it did convince the jury that Natson was the shooter, there would still be an open question as to whether Armstrong was the second man involved in the crime. By contrast, in Holmes, the defendant sought to admit much stronger evidence in the form of testimony from four separate witnesses that the third party had either admitted to the crime, or said he knew that Holmes was innocent. 547 U.S. at 323. Several other witnesses would have testified that this person was in the victim's neighborhood at the time of the crime. Id.

As suggested by the Court of Appeals for the Third Circuit in <u>Williams</u>, there may be circumstances where a defendant's constitutional right to present a defense might override Pennsylvania Rule of Evidence 404(b). This case, however, does not present those circumstances. As applied by the trial judge, Rule 404(b) was neither arbitrary, nor disproportionate to the purpose it was designed to serve. Under <u>Holmes</u>, therefore, Armstrong's constitutional rights were not violated.

B.   <u>Ineffective Assistance of Counsel</u>

1.   <u>Applicable Standards</u>

Armstrong's claims of ineffective assistance of counsel were raised in his PCRA petition, and discussed by the trial court and Superior Court. There is no doubt, therefore, that AEDPA permits this Court to disturb the state courts' conclusions only if they involved an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d).

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court set out the Constitutional standard for ineffective assistance of counsel:

> First the defendant must show that the counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced that defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The Superior Court used the essentially-identical Pennsylvania standard for ineffective assistance of counsel in considering Armstrong's claims in its decision on his PCRA petition.

Under this standard, a claimant must prove (1) that the underlying issue is of arguable merit; (2) that counsel lacked a reasonable, strategic reason for acting as he or she did; and (3) prejudice. Commonwealth v. Armstrong, No. 950 EDA 2006, supra, at 5, citing Commonwealth v. Lester, 772 A.2d 997 (Pa. 1998); and see Commonwealth v. Pierce, 527 A.2d 973, 976 (Pa. 1987) (expressly stating that Pennsylvania uses the Strickland standard).

2.      Testimony Regarding the End of Armstrong's Interview By Detective Dougherty

As above, Armstrong maintains that his trial counsel violated his Fifth Amendment right to silence when he failed to object to Detective Dougherty's testimony that, at the end of their interview on June 16, 2003, Armstrong said "I have nothing more to say, I just have to roll the dice" and when he repeated that statement during closing.  The Superior Court rejected this claim in Armstrong's PCRA petition.

The Pennsylvania rule applied by the Superior Court, was that in general, comments on an accused's silence are impermissible.  Commonwealth v. Turner, 454 A.2d 537 (Pa. 1982). This is fully consistent with the United States Supreme Court's ruling in Doyle v. Ohio, 426 U.S. 610 (1976) that it is improper for a prosecutor to cause a jury to draw an impermissible inference of guilty from a defendant's post-arrest silence.

The Superior Court explained the other state law it applied as follows:

> However, what is important to remember is that it is the adverse use of a defendant's silence that causes prejudice and is impermissible.  To that end, we note that "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that the silence is the equivalent of a tacit admission of guilt." Commonwealth v. Whitney, 708 A.2s 471, 478 (Pa. 1998).

Commonwealth v. Armstrong, No. 950 EDA 2006, supra, at 8.

The District Court for the Middle District of Pennsylvania has said that Pennsylvania's focus on the context in which the comments were made is consistent with United States Supreme Court precedent which establishes that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Douglass v. Tennis, Civ. A. O. 3:CV-05-0025, 2006 WL 1071814 (M.D. Pa. 2006), citing Smith v. Phillips, 455 U.S. 209, 219 (1982).  I agree.  Thus, the Superior Court's decision did not involve an unreasonable application of federal law.

In applying this law to the facts of Armstrong's case, the Superior Court wrote

> The record indicates that the reference complained of was not used to create an adverse inference for Armstrong.  Rather, as the PCRA court stated:  the 'interview had to conclude at some point, and Detective Dougherty simply descried how the termination occurred.'  Moreover, rather than creating an adverse inference, defense counsel used the complained of testimony in his closing argument to highlight Armstrong's claim of innocence.

Commonwealth v. Armstrong,  No. 950 EDA 2006, supra, at 9.

The court then quoted the portion of counsel's closing argument, cited above at pages five and six, where he said: "And that's when the comment about the roll of the dice was made to Mr. Armstrong.  To convey to Mr. Armstrong that we're going to get you even if you are innocent" and "And when they told him, well, you can roll the dice, the odds are in our favor, he decided he's just going to roll the dice, I am just going to have to roll the dice.  Innocence will sometimes do that."

This was not an unreasonable determination of the facts.  Detective Dougherty testified on direct for seventeen pages of transcript about what Armstrong said to him in their interview.  Notes of Testimony, June 16, 2003, 86-103.  Of this testimony, only fifteen lines concerned

15

Armstrong's ending the interview.  Id. at 102, lines 23-25, and 103 at lines 1-11 and 19-20.  Thus, the focus was on what Armstrong did say, and not on the fact that he ultimately ended the conversation.  Detective Dougherty was also cross-examined at considerable length, and the subject of Armstrong's ending the interview never arose.  Id. at 107-159.

What is more, in his closing argument, the prosecutor spoke for 26 lines about what Armstrong said in the interview, principally his eagerness to find out how he had been identified, and never even mentioned the fact that he ended it.  Notes of Testimony, June 18, 2003, at 80-81.  Clearly, the content of the interview was what interested the prosecutor, and not its termination.

In this context, counsel's failure to object to Detective Dougherty's limited mention of Armstrong ending the interview – and even his own later mention of Armstrong's silence in the face of the "rolling the dice" comment – occurred in a context not at all likely to suggest to the jury that Armstrong had tacitly admitted guilt.  In terms of Strickland, therefore, Armstrong was not prejudiced by counsel's actions, even if they could be construed as deficient.

3.    Testimony As To Detective Dougherty's Belief That Armstrong Was Lying

Armstrong has also called his trial counsel ineffective for soliciting Detective Dougherty's opinion that he was lying when he said he was in the neighborhood of the shooting to buy a kitchen appliance.  He has cited Commonwealth v. Kitchen, 730 A.2d 513, 521 (Pa. Super. 1999), in which the Pennsylvania Supreme Court precluded a state trooper's testimony suggesting a defendant had lied during questioning, because, as when a prosecutor states that a witness is lying, it might convey to the jury a government *imprimatur* of truth.

16

As to Armstrong's counsel's questioning of Detective Dougherty, the Superior Court wrote:

> [T]he questions were very obviously designed to support the argument that the police were simply seeing what they wanted to see and believing what they wanted to believe without bothering to check out other possible explanations.
>
> In a case that is based virtually only upon identifications ten years after the fact, it is not unreasonable strategy for the defense to attempt to portray the police as simply accepting the original identification of the perpetrator from a possibly tainted source as an easy way to clear an old crime from the books. The questions now complained of on appeal were a part of that strategy and do not represent instances of ineffective assistance of counsel.

Commonwealth v. Armstrong, supra, at 11.

This conclusion does not violate federal law. Even if the federal proscription against a prosecutor's "vouching" by giving his opinion concerning the "credibility of a witness and expressing his personal opinion concerning the guilt of the accused" (as set forth in United States v. Young, 470 U.S. 1, 18-19 (1985)), could be extended to a law enforcement agent, as the state did in Kitchen, a finding of vouching requires that the opinion given be based "on either the [voucher]'s personal knowledge or other information not contained in the record." U.S. v. Walker, 155 F.3d 180, 187 (3d Cir. 1998).

Here, Detective Dougherty testified that he believed that Armstrong was lying about his plans to buy an appliance because he had already told the detective that he had no money with him that day. The basis for his statement was, therefore, on the record and could be appropriately evaluated by the jury. Since Detective Dougherty's testimony did not violate Kitchen or applicable federal law, Armstrong's counsel was not obviously ineffective for eliciting it.

Further, the Superior Court's decision that the questioning was part of counsel's overall defense tactic showing that the detectives had pre-judged Armstrong's guilt was consistent with Strickland, under which strategic choices made by counsel are presumed reasonable: "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected ... if they are based on professional judgment." Strickland, supra, 466 U.S. at 681.

The Superior Court's decision was also a based on a reasonable determination of the facts. Counsel's strategy was clear in his closing argument, where he said:

> So, when detective Dougherty testified, he's trying to let you know that you should ... convict Mr. Armstrong because the homicide detectives didn't believe the evidence against Natson and Clarence Glenn. Well, that is ridiculous. What would be the purpose of having a courtroom? What would be the purpose of a trial? What would be the purpose of a jury? What would be the purpose of all the instructions that you are the judge of the facts if we allow the homicide detectives to make the decision about who is guilty and who is not guilty, and who should be convicted of first degree murder? If you allow yourselves to be influenced by the homicide detectives, by Detective Dougherty's opinion about who is guilty in this case, well then, I would submit to you that you are aggregating [*sic* "abdicating"?] your responsibility. It is your job to judge the facts, not Detective Dougherty's. So I would suggest to you that Detective Dougherty's going to make a big deal about that he said, well, I didn't have any money. Well, excuse me, but we're allowed to go window shopping.

Notes of Testimony, June 18, 2003, at 62-63.

As with his other claims, then, Armstrong has not shown a basis for habeas relief. The state court's decision was not contrary to, nor did it involve an unreasonable interpretation of federal law, and did not result in a decision based on an unreasonable determination of the facts of the case in light of the evidence presented.

IV.	Conclusion

Based on the foregoing, I make the following:

**R E C O M M E N D A T I O N**

AND NOW, this 12th day of November, 2008, IT IS RESPECTFULLY RECOMMENDED that the petition for writ of habeas corpus be DENIED.  There is no basis for the issuance of a certificate of appealabilty.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY ARMSTRONG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN KERESTER | : | NO. 08-1165 |

O R D E R

EDMUND V. LUDWIG, J.

       AND NOW, this     day of    , 200__, upon careful and independent consideration of the petition for writ of habeas corpus, and after review of the Report and Recommendation of the United States Magistrate Judge Jacob P. Hart, it is

       ORDERED that:

       1.    The Report and Recommendation is APPROVED and ADOPTED;

       2.    The petition for writ of habeas corpus is DENIED.

       3.    There is no basis for the issuance of a certificate of appealability.


                      BY THE COURT:


                      _____
                      EDMUND V. LUDWIG, J.